PERKINS MANUFACTURING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 12741, 23894, 35148, 37930. Promulgated November 8, 1929.

*Henry Ravenel, Esq.,* and *Henry Elliott, Esq.,* for the petitioner.
*M. E. McDowell, Esq.,* for the respondent.

1346

OPINION.

SMITH: The petitioner claims that it is entitled to a paid-in surplus in the computation of invested capital for 1920 and 1921 in the amount of $73,518.82. The basis of this claim is that the fair value of the assets paid in to the petitioner in exchange for its capital stock of $100,000 was $173,518.82, such value being allocated as follows:

| | |
|---|---|
| Buildings | $69,424.51 |
| Real estate | 35,000.00 |
| Machinery and equipment | 69,094.31 |
| Total | 173,518.82 |

The amounts claimed as the values for the buildings and machinery are the "sound" values determined by the appraisal of such assets as of August 11, 1913. The respondent, on the other hand, claims that he erred in the determination of the deficiency for 1920 in that he considered the cost of petitioner's assets in August, 1913, for both the purposes of computing invested capital and depreciation for 1920 to be $116,513.99, whereas said cost was $70,810.52. He therefore contends that the true deficiency for 1920 is $5,565.86 in place of $3,121.41, the amount shown by the deficiency notice, and that the true deficiency for 1922 is the amount of $1,495.29 in place of $1,139.70, the amount shown by the deficiency notice. The amount of the deficiency determined for 1922 is predicated upon a basic cost of assets acquired by the petitioner in August, 1913, of $116,- 513.99. The deficiencies determined for years subsequent to 1922 were predicated upon a cost of assets to the corporation upon its organization in 1913, including real estate, of $70,810.52.

Before considering the question of the cost or values of the assets acquired by the corporation in 1913, it is necessary first to consider a question of law as to whether the properties were paid in to the petitioner in exchange for shares of stock. The petitioner contends, on the one hand, that the equitable title to the assets of the bankrupt was in the Georgia Railroad Bank at the time of the organization of the petitioner and that that bank paid in those assets together with cash for the $100,000 par value of capital stock. The respondent, on the other hand, contends that at a public sale of the bankrupt estate the property covered by the mortgages was bid in by Wm. E. Bush for the bondholders; that he was acting as agent for the trustee of such bondholders, the Planters Loan & Savings Bank; that the properties were sold to Wm. E. Bush free from liens and at his direction deeded by the trustees in bankruptcy to the

Planters Loan & Savings Bank; that subsequent to that date the Planters Loan & Savings Bank sold the properties secured by mortgage to the petitioner for $10,810.52 cash and $60,000 of its first mortgage bonds. The claim of the respondent is therefore that the cost of these properties to the petitioner was $70,810.52.

The evidence shows that prior to the sale of the properties on July 1, 1913, Wm. E. Bush, acting in the interest of the first mortgage bondholders, had numerous conferences with Jacob Phinizy, president of the Georgia Railroad Bank, which had an unsatisfied claim against the bankrupt of approximately $45,000 secured by $50,000 par value of second mortgage bonds. Bush was interested in the property only for the purpose of securing the first mortgage bondholders. He entered into an arrangement with Phinizy acting for the Georgia Railroad Bank that he (Bush), would bid in the property for the first mortgage bondholders and turn it over to a new corporation to be organized in consideration of a payment to him of an amount equaling the face value of the first mortgage bonds outstanding plus accrued interest. The Georgia Railroad Bank would advance as much money as was necessary to put the new corporation upon its feet, in exchange for which it would receive the capital stock of the new corporation. The details of the agreement reached between Phinizy and Bush were not worked out until after the sale of the property at public auction. We can not doubt that this agreement existed. At the auction Bush bid in the property at an amount less than the face value of the first mortgage bonds and Phinizy bid in the property of the bankrupt not covered by the first mortgage bonds at an amount of $8,915, which he paid to the trustees in bankruptcy. The bankrupt corporation continued in business without interruption. Phinizy did not take from the plant or attempt to take from it any part of the property which he had bid in at $8,915. Pursuant to the agreement reached between Phinizy and other officers or directors of the Georgia Railroad Bank, the petitioner corporation was organized and the bank advanced to it such amounts of money as were necessary to put it on its feet. Pursuant to the agreement also, the Planters Loan & Savings Bank deeded to the petitioner corporation the property to which it had taken title in exchange for an issue of $60,000 of its first mortgage bonds and $10,810.52 in cash.

In the circumstances of this case we can not doubt that the Georgia Railroad Bank prior to the organization of the petitioner had equitable title to the property which had been bid in by Bush. The Planters Loan & Savings Bank was not interested in the property which had been bid in for it by Bush except for the protection of the first mortgage bondholders. We have no doubt that if re-

quested it would have deeded to the Georgia Railroad Bank for $70,810.52, the property in question. Then the Georgia Railroad Bank could have paid in to the petitioner corporation the assets thus acquired. In such case there could be no question that the assets would have been paid in to the petitioner corporation in exchange for capital stock. This step was unnecessary. The Georgia Railroad Bank clearly having a right to acquire the assets from the Planters Loan & Savings Bank at a price of $70,810.52, caused that bank to transfer those assets to the petitioner corporation instead of to itself. This we think was a payment in to the petitioner corporation of the assets in question in exchange for shares of capital stock.

The facts in the instant case are in substance similar to those which obtained in *Lexington Realty Co.*, 12 B. T. A. 850. In that case certain individuals had contracted to purchase property from the owner and to form the realty company to acquire the property. After its formation the realty company did acquire the property direct from the owners for cash and stock and issued all its common stock to the holders of the original contract. In its opinion the Board stated:

All the transfers occurred at the same time and as part of the same transaction and looking at the substance of the whole transaction it is apparent that in purchasing the property the petitioner turned over $75,000 in cash, $25,000 par value second preferred stock and $59,700 par value of common. In other words, regardless of the identity of the persons to whom the cash and the various kinds of stock were paid, the petitioner parted with cash and stock of the above amounts in return for which it received property having an actual cash value of $162,437.50. * * *

So, in the instant case, we have no hesitation in saying that the petitioner issued first mortgage bonds in the amount of $60,000 and its capital stock of $100,000 in exchange for certain amounts of property and cash paid in to it by the Georgia Railroad Bank. The cash paid in was in the amount of $53,796.53. The Georgia Railroad Bank had a claim against the bankrupt estate of approximately $45,000, covered by the second mortgage bonds. It was to protect this claim that the Georgia Railroad Bank was willing to assume the additional risk of the cash payment of $53,796.53.

The petitioner contends that the fair market value of the assets paid in to the petitioner corporation at the date of payment, exclusive of the cash advanced by the Georgia Railroad Bank, was $173,518.82. This was the value for the buildings and machinery determined by an appraisal company which made an appraisal of the assets of the bankrupt in August, 1913. Its appraisal did not cover the real estate. But the petitioner contends and has offered evidence in support of a valuation for the real estate of $35,000. As we understand the petitioner's contention, it is that the value of the

depreciable assets plus the real estate, in August, 1913, was $173,-518.82, and that this was exclusive of cash paid in by the Georgia Railroad Bank of $53,796.53. The sum of these two amounts is the value of the properties paid in, $227,315.35. It is to be noted, however, that $10,810.52 of the amount paid in by the Georgia Railroad Bank in 1913, was used to make a payment to the Planters Loan & Savings Bank. We think, therefore, that in any event the $227,-315.35 claimed as the value of the assets paid in must be reduced by that cash payment. With this correction the claimed values of the properties paid in, inclusive of the cash payment of $53,796.53, was $216,504.83. The deduction from this amount of $60,000 bonds and $100,000 capital stock leaves an apparent paid-in surplus of $56,504.83.

We are of the opinion, however, that the evidence does not warrant a finding that the cash value of the properties paid in to the petitioner corporation was as great as the amount contended for by the petitioner. One of the deponents for the petitioner, M. E. Dyess, deposed, with respect to the value of the assets of the bankrupt, that he attended the public sale of the property and would have been willing to bid upon the property had it been sold at what he regarded a sacrifice price. Asked if he would have considered anything less than $100,000 a bargain price for the property answered:

A. I would not have paid $100,000, would not have offered that.

Q. And your company was not willing to make a bid comparable to the market value of the property, which you thought?

A. Not as a going property, no.

He thought, however, that the value of the property at the date of sale was approximately $175,000.

The Planters Loan & Savings Bank, as trustee under the first mortgage, answering the petition of the trustees in bankruptcy for an order to sell the property at public sale, prayed the court to order a sale free of lien, stating "it did not believe the properties of the bankrupt to be worth $120,000 and interest."

As above indicated, the Georgia Railroad Bank had a claim against the bankrupt estate of approximately $45,000. It paid an additional amount of $53,796.53 for the stock of the petitioner. Its total investment in the $100,000 capital stock was therefore slightly less than $100,000. It entered into an agreement with Mulherin in November, 1913, that he should have the privilege of buying the capital stock at par, plus interest paid on bonds and bond retirement and any other indebtedness due the Georgia Railroad Bank, that arrangement to be in effect for one year.

We think this evidence disproves the claim of the petitioner to a paid-in surplus in the computation of invested capital. The value

of the property paid in was not " clearly and substantially in excess of the par value " of the stock and bonds issued for it.

Many of the books of account of the predecessor corporation have been lost or destroyed. The journal of the petitioner for 1913 shows that the plant account was placed upon its books at December 31, 1913, at a value of $116,513.99. It is not in evidence whether this figure includes real estate. It apparently represented the cost of the plant to the petitioner corporation. We can not determine from the evidence that the cost or the cash value of the plant paid in to the petitioner corporation was in excess of that amount. The respondent has determined the amounts of deductible depreciation for 1920 and 1922 upon the basis of the journal entry above referred to. In the absence of satisfactory proof as to a greater cost or value for the assets than the basis used by the respondent, the use of such basis for the purpose of computing allowable depreciation is sustained.

The respondent computed depreciation for the years 1923 to 1926, inclusive, upon the basis of the cost of assets to the petitioner corporation at its organization in 1913 at $70,810.52. This is upon the theory that the cost of those assets to the petitioner at the date of organization was simply the amount paid by it to the Planters Loan & Savings Bank for the assets. But, as above indicated, we are of the opinion that that amount is not the cost or the fair market value of the assets paid in to the petitioner for its capital stock and bonds. The Georgia Railroad Bank had a claim against the bankrupt estate of $45,000 and it paid an additional amount of $53,796.53 for the $100,000 capital stock of the petitioner. We think that $116,513.99 shown as the value of the plant account on the books at December 31, 1913, represents the fair market value of the plant on that date as nearly as it can be determined. We therefore are of the opinion that the allowance for depreciation for the years 1923 to 1926, inclusive, should be based upon the fair market value of such assets in 1913 of $116,513.99.

The petitioner has alleged as an error in the determination of the deficiency for 1921 the denial by the respondent of a loss sustained during that year on obsolete machinery. The stipulation filed by counsel upon this point is to the following effect:

In computing the deficiency in the 60-day letter respondent has disallowed a deduction taken in the return of the sum of $524.77 for abandoned machinery, resulting from his determination that said machinery had a cost basis of the sum of $1,832.08. The machines were in fact abandoned in 1920 and if the petitioner sustains in this proceeding its claim of a depreciation basis for machinery of an amount greater than $46,965.05 (used by respondent in computing deficiency in said letter) then petitioner is entitled to an increase in the loss allowed to be determined on final settlement. * * *

Inasmuch as we can not determine that the basis used by the respondent in the determination of allowable depreciation for 1920

is in error, the claim of the petitioner of an error in this regard is not sustained.

The stipulation likewise shows that for the year 1921 the respondent determined a net income of $1,987.26, allowing depreciation on the same basis as allowed for 1920 in the deficiency letter. It was stipulated that, if the depreciation is to be based upon a different value for the assets received in 1913 and a net loss should result for the year 1921, such net loss should be allowed as a deduction in 1922. Since the evidence does not warrant a different basis for the determination of depreciation for 1920 and subsequent years from that used by the respondent, this claim of the petitioner must be denied.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*